**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

JAMES PRITCHARD, :

                Plaintiff,

-vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant. :

Case No. 3:08-cv-189

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI on October 16, 2002, alleging disability from September 30, 1999, due to a mental impairment. (Tr. 53-55; 884-86; 86). Plaintiff's applications were denied initially and on reconsideration. (Tr. 33, 38, 888, 894). A hearing was held before Administrative Law Judge Melvin Padilla, (Tr. 897-933), who determined that Plaintiff is not disabled. (Tr. 11-29). The Appeals Council denied Plaintiff's request for review, (Tr. 5-7), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff has severe bipolar disorder and polysubstance abuse, but that he does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 18, ¶ 3; Tr. 22, ¶ 4). Judge Padilla also found that Plaintiff has the residual functional capacity to perform a limited range of work at all exertional levels. (Tr. 23, ¶ 5). Judge Padilla then found that Plaintiff is able to perform his past relevant work as a lawn care worker. (Tr. 27, ¶ 7). In the alternative, Judge Padilla found that using section 204.00 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, there is a significant number of jobs in the economy that Plaintiff is capable of performing. *Id.*, ¶ 10. Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 29).

The record contains a copy of Plaintiff's voluminous treatment notes from Eastway Behavioral Health Center dated June, 2001, through November, 2004. (Tr. 291-391). Those records indicate that when Plaintiff was first evaluated at Eastway, it was noted that Plaintiff was in learning disabled classes in school, was diagnosed with ADHD as a child, was unable to maintain

employment, that he sold cars occasionally to support himself, that he experimented with drugs in high school, and that he currently smoked marijuana about two times a month or less. *Id.* It was also noted that Plaintiff's speech was normal, his mood was anxious, his affect was congruent, and that his thought processes were normal. *Id.* Plaintiff's diagnosis was identified as bipolar disorder, severe and without psychotic features and he was assigned a GAF of 45. *Id.*

Plaintiff was subsequently evaluated by psychiatrist Dr. Wright who reported on July 24, 2001, that Plaintiff was a little restless, looked anxious and tense at first but relaxed a little during the interview, that there was no evidence of psychosis, and that his history suggested attention deficit disorder. *Id.* Dr. Wright also reported that Plaintiff was oriented, was not bizarre, and that his diagnoses were anxiety disorder NOS, rule out attention deficit hyperactivity disorder, rule out depressive disorder NOS, and rule out personality disorder. *Id.* Dr. Wright assigned Plaintiff a GAF of 50. *Id.* Plaintiff continued to receive treatment at Eastway and on June 25, 2002, psychiatrist Dr. Justiniano-Toro reported that although Plaintiff had previously been diagnosed with anxiety disorder he (Dr. Justiniano-Toro) believed that Plaintiff had bipolar disorder. *Id.*

On September 4, 2003, Eastway psychiatrist Dr. Wee reported that Plaintiff was alert, was doing well on medications, and that other than sexual difficulties, he had no other symptoms. *Id.* Dr. Wee identified Plaintiff's diagnosis as bipolar disorder. *Id.*

The record contains a copy of Plaintiff's treatment notes from Good Samaritan Hospital Crisis Care dated April to June, 2002. (Tr. 148-70). Those records reveal that Plaintiff was self-referred to Crisis Care because he thought that the medications he had been prescribed by his mental health treating sources at Eastway were not working as quickly as he wanted them to work. *Id.* Plaintiff's diagnoses were identified as ADHD residual type and obsessive compulsive disorder

5

versus bipolar disorder and he was referred back to Eastway. *Id.*

Examining psychologist Dr. Martin reported on February 16, 2003, that Plaintiff had difficulty completing simple, repetitive tasks during the examination, had been in outpatient mental health treatment "on and off" for two years, was in outpatient substance abuse treatment in the past, was in learning disabled classes in school, graduated from high school, was discharged from Navy basic training "for having a 'personality disorder'", and that he has had 53 jobs. (Tr. 174-79). Dr. Martin also reported that Plaintiff's affective responses were labile, his mood was irritable and moderately depressed, he was anhedonic and apathetic about his future, was oriented, manifested no lapses in his level of consciousness, that he stopped using alcohol about two years ago, and that he occasionally uses marijuana. *Id.* Dr. Martin noted that Plaintiff's verbal IQ was 85, his performance IQ was 92, and his full scale IQ was 88 placing him in the low-average range of intelligence, testing revealed attentional versus memory impairments, and that he read at the 7.5 grade equivalent level. *Id.* Dr. Martin identified Plaintiff's diagnoses as bipolar disorder mixed type of moderate severity, attention-deficit/hyperactivity disorder NOS, cannabis abuse, and sedative or hypnotic dependence; he assigned Plaintiff a GAF of 50. *Id.* Dr. Martin opined that Plaintiff's abilities to relate to others, maintain attention and concentration, and withstand the stresses and pressures of daily work activity were moderately impaired and that his ability to understand, remember, and follow instructions was not impaired. *Id.*

Plaintiff was hospitalized May 24-29, 2003, after he took an overdose of medication with suicidal intention. (Tr. 200-11). During that hospitalization, it was noted that Plaintiff had a history of several suicide attempts in the past, that as a child he was physically and emotionally abused by his father, that he said his overdose was a mistake, and that he did not admit to any

6

suicidal ideation during his hospitalization. *Id.* Plaintiff was treated with medications and therapy and discharged with the diagnoses of adjustment disorder with mixed disturbance of emotion and conduct, post-traumatic stress disorder, alcohol dependence, cannabis abuse, and borderline personality disorder; he was assigned a GAF of 65 on discharge. *Id.*

Plaintiff was again hospitalized May 31-June 4, 2003, when his aunt brought him to the hospital reporting that Plaintiff was increasingly depressed, had mood swings, and suicidal ideation. (Tr. 211-29). At the time he was hospitalized, it was noted that Plaintiff's drug screen was positive for cocaine and marijuana, that he was using crack and hallucinogens, that he had suicidal ideation, and that he was homeless. *Id.* Plaintiff was treated with medications and therapy, responded well, and was discharged with the diagnoses of possible bipolar disorder type 2 versus depressive disorder, chemical dependency "with alcohol, cannabis, etc.", and mixed personality traits borderline predominating. *Id.*

During that period of time, as noted above, Plaintiff was receiving outpatient mental health treatment at Eastway. (Tr. 291-391). Plaintiff saw Dr. Wee at Eastway about every three months for medication management and he had frequent assistance from a community support specialist. *Id.* In addition, beginning in January, 2004, Plaintiff saw a therapist at Eastway about once a month. (Tr. 305-14).

Plaintiff was hospitalized August 8-17, 2004, for the possibility of an overdose reported by Plaintiff's girlfriend. (Tr. 818-30). At the time of his admission, Plaintiff denied suicidal ideation and information from his girlfriend revealed that Plaintiff was "abusing his psychiatric medications and taking handfuls to get high". *Id.* It was also noted that prior to admission Plaintiff had told his health care providers that he wanted to end his life. *Id.* Plaintiff's

7

admitting GAF was 20 and he was treated with medications and counseling. *Id.* Plaintiff advised his heath care providers that, "you cannot keep me here forever, and it will help my SSI case." *Id.* During the hospitalization, Plaintiff's health care providers began a probate process during which the judge determined that Plaintiff should be an outpatient commitment. *Id.* Plaintiff was discharged in stable condition with the diagnoses of bipolar disorder most recent episode depressed with a history of alcohol dependence, rule out borderline intellectual functioning, and his GAF was 50-55. *Id.*

Following the August, 2004, hospitalization, Plaintiff received assistance from Alternate Solutions Home Care with housekeeping and personal care. (Tr. 781-811). In addition, Plaintiff's medications were dispensed to him from a locked box. (Tr. 628-790).

Plaintiff was hospitalized October 1-7, 2004, after he took an overdose of medications. (Tr. 262-90). At the time he was admitted, it was noted that Plaintiff denied being suicidal and he reported that he took the overdose to sleep. *Id.* It was also noted that Plaintiff was quite distraught, very anxious, had a depressed mood, and appeared to be somewhat confused. *Id.*

Dr. Wee reported in November, 2004, that Plaintiff's abilities to make occupational, performance, and personal-social adjustments were poor, and that he was unable to perform any work-related mental activities. (Tr. 291-97). Dr. Wee also reported that Plaintiff lacked the capacity to make rational decisions, was not stable on medications, and that he may have psychotic symptoms that would interfere with his deciding. *Id.* Dr. Wee noted that Plaintiff decompensated often and needed periodic hospitalization for stabilization. *Id.*

Plaintiff began receiving mental health treatment at South Community in January, 2005, because of his reported dissatisfaction with the care he had received at Eastway. (Tr. 434-50).

At the time he was initially evaluated by psychiatrist Dr. Fitz, it was noted that Plaintiff had a faint trace of body odor, his speech was normal but slightly disturbed due to ill-fitting dentures, his affect was non-labile and appropriate, his thought processes were linear without frank loosening of association or flight of ideas, and that he was alert and oriented. *Id.* It was also noted that Plaintiff had a long history of unstable mood as well as alcohol and cannabis dependence and his diagnoses were identified as bipolar disorder, most recent episode unspecified, cannabis dependence in early remission, and alcohol dependence in early remission; he was assigned a GAF of 45. *Id.*

Examining psychologist Dr. McIntosh reported on June 29, 2005, that Plaintiff seemed very disorganized, had been seen through the local community mental health center network over several years, had been psychiatrically hospitalized four times, sees his psychiatrist every three months, works with a case manager, and that his medications were kept in a lock box so that he has access to only one day supply at a time. (Tr. 392-99). Dr. McIntosh also reported that Plaintiff graduated from high school, last worked three years ago, reported that he did not drink alcoholic beverages often, and he denied the abuse of drugs. *Id.* Dr. McIntosh noted that Plaintiff maintained a sad and somber affect, that his overall mood was depressed, he was somewhat agitated, he was alert and oriented, he had no lapses in alertness or periods of mental confusion, his speech and thought processes were normal, he did not appear preoccupied or obsessed, and that he had very limited insight. *Id.* Dr. McIntosh noted further that Plaintiff seemed to be a very disturbed man who has attempted suicide impulsively in the past, has poor impulse control, was very depressed, and that he appeared to have a lot of strange and weird thoughts. *Id.* Dr. McIntosh identified Plaintiff's diagnosis as major depression recurrent and severe with psychotic symptoms and he assigned Plaintiff a GAF of 47. *Id.* Dr. McIntosh opined that Plaintiff's ability to understand, remember, and

9

carry out one or two-step job instructions was moderately impaired, his ability to interact with others was moderately to severely impaired, his capacity to withstand the stress and pressure of day-to-day work activity was severely impaired, and that his ability to maintain concentration and attention sufficient for simple repetitive tasks was quite poor. *Id.*

Plaintiff continued to receive mental health treatment at South Community through at least February, 2006. (Tr. 835-66). In addition, Plaintiff continued to receive support services from South Community. *Id.*

A psychologist testified at the hearing as a medical advisor (MA). (Tr. 918-29). The MA testified that Plaintiff's diagnoses were bipolar disorder, alcohol and marijuana dependence, misuse if not abuse of prescribed medications, that he would meet Listings 12.09 and 12.04 but that it was not clear from the record if Plaintiff's credibility could be accepted that he is not drinking recently and that marijuana use is occasional. *Id.* The MA testified further that Plaintiff's substance abuse is material, that with decreased substance use and correctly monitored medications there was improvement in Plaintiff's impairment, and that it did not appear that the alcohol and marijuana have been consistently decreased. *Id.* The MA also testified that Plaintiff was able to perform simple repetitive tasks in line with the kinds of work he's done in the past, and that he talked about repairing engines so he did seem to have the abilities to perform detailed tasks when he learned them. *Id.* The MA testified that Plaintiff should not deal with the public, not perform jobs that require teamwork, should not have production standards, and that he should have minimal contact with co-workers and supervisors. *Id.* The MA noted that the record revealed that Plaintiff's GAF scores varied slightly, that the treatment notes did not indicate florid psychosis, and that Plaintiff's periods of decompensation have been associated with some substance use. *Id.* The MA testified

in addition that Plaintiff did not give Dr. McIntosh an accurate history particularly about his substance abuse, that Plaintiff had described his symptoms more intensely to Dr. McIntosh than he had to other mental health care providers, and that contrary to Dr. McIntosh's findings, there was no corroborating evidence elsewhere in the record that Plaintiff exhibited psychotic symptoms. *Id.* Finally, the MA testified that most of Plaintiff's episodes of decompensation had been associated with substance use and that none of them lasted longer than two weeks. *Id.*

In his Statement of Errors, Plaintiff alleges that the Commissioner erred by using the wrong standard in assessing the materiality of his substance abuse and by failing to give the proper evidentiary weight to Dr. Wee's and Dr. McIntosh's opinions. (Doc. 9).

In The Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104-121, 110 Stat. 852, 853 (eff. Mar. 29, 1996), Congress amended the Social Security Act to essentially prohibit the award of SSD and SSI to individuals for whom alcoholism or drug addiction is a contributing factor material to their disability determination. *See,* 42 U.S.C. §§423(d)(2)(C), 1382c(a)(3)(J). The House Report on the Act specifically states that this law was enacted to:

> ...[E]liminate payment of cash Social Security and SSI disability benefits to drug addicts and alcoholics, to ensure that beneficiaries with other severe disabilities who are also drug addicts or alcoholics are paid benefits through a representative payee and referred for treatment and to provide additional funding to States to enable recipients to continue to be referred to treatment sources. ...

H.R. 104-379, 104th Cong., 1995 WL 717402 (Leg. Hist.) at *20 (Dec. 4, 1995).[1]

The Report indicates Congress' desire to remove "a perverse incentive that affronts working taxpayers and fails to serve the interests of addicts and alcoholics, many of whom use their

---

[1] No Senate or House Reports were submitted with the legislation for inclusion in the U.S. Code Congressional and Administrative News. Hence, the Court's citation to the electronic source of the House Report. *See,* 1996 U.S.C.C.A.N. 606.

disability checks to purchase drugs and alcohol, thereby maintaining their addictions." *Id.*

> With respect to the issue of substance abuse, the Regulations provide in relevant part:
>
> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical and mental limitations upon which we based our current disability determination would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>    (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535, 416.935 Accordingly, the ALJ's duty when faced with evidence of substance abuse is relatively straightforward and he should:

> ...[P]erform a three part analysis. First, the ALJ must determine whether the claimant is disabled taking into account the "gross" total of claimant's limitations, including the effects of any substance abuse disorders....Second, that ALJ must make a determination that drug or alcohol abuse is a concern...Third, the ALJ must determine, based on substantial evidence, what limitations would remain in the absence of claimant's alcoholism or drug addiction and whether, based on those "net" limitations which do not encompass any limitations attributable to alcohol or drug use, plaintiff is disabled under the five step sequential evaluation process. If the remaining or "net" limitations would be disabling, the drug abuse and alcoholism is not material, and the individual is disabled; if the remaining limitations would not be disabling, the drug abuse and alcoholism is material and the individual is not disabled within the meaning of the Act.

See *Parton v. Commissioner of Social Security,* 2008 WL 4657086, *9 (S.D Ohio Oct. 21, 2008)(citation omitted); *Williams v. Barnhart*, 338 F.Supp.2d 849, 863 (M.D.. Tenn. 2004).

In determining that Plaintiff is not disabled, Judge Padilla relied on the MA's testimony and noted that while Plaintiff meets the Listings his substance abuse was a contributing

12

factor material to Plaintiff's condition satisfying Listing. (Tr. 24). In doing so, Judge Padilla complied with the Regulations which address the issue of eligibility for benefits in light of an individual's substance abuse.

First, it appears that only the MA had access to a true picture of Plaintiff's drug and alcohol use because Plaintiff provided various care providers with varying information as to his substance use and abuse. For example, in February, 2003, Plaintiff reported to Dr. Justinian-Toro that he was not compliant with the directions as to taking his Klonopin. (Tr. 367). In that same month, Plaintiff reported to Dr. Martin that he was dependent on Klonopin. On May 24, 2003, Plaintiff told the health care providers at Good Samaritan Hospital where he was hospitalized that he drank six to twelve beers a day but he denied drug use. (Tr, 209). Just a few days later, specifically on May 31, 2003, when Plaintiff was in the Kettering Hospital, he advised his mental health care providers that he was not compliant with his medications or with his treatment at Eastway, and that he used crack cocaine, alcohol, and marijuana. (Tr. 215; 226, 228). In August, 2004, when Plaintiff was at Miami Valley Hospital, Plaintiff denied both drug and alcohol abuse, yet his girlfriend reported that Plaintiff was abusing his psychiatric medications and taking handfuls to get high and his family expressed concern about his need for drug rehabilitation. (Tr. 410; 819-21). Indeed, as noted above, the record reflects that subsequent to that hospitalization, when Plaintiff returned home, his medications were kept in a locked box and dispensed to him by a home health professional. Further, when Plaintiff was admitted to Grandview Hospital in October, 2004, it was noted that Plaintiff was not reliable with respect to giving his substance abuse history and that he downplayed his drug and alcohol abuse. (Tr. 272).

The record reveals further that in January, 2005, when he left Dr. Wee's care at

Eastway and sought treatment at South Community, Plaintiff admitted to a history of alcohol and marijuana abuse, that he continued to use marijuana and alcohol, and that he refused to attend drug treatment and that his counselor questioned his credibility in that Plaintiff was "trying to decide on the story he's going to tell." (Tr. 867; 870-71; 876). As noted above, when Dr. McIntosh evaluated him, Plaintiff reported that he did not drink alcohol and he denied drug abuse.

Further, as the MA noted, Plaintiff's hospitalizations were associated with his apparent misuse of his prescription medications. This conclusion is supported primarily by the fact that Plaintiff's condition improved once his medications were monitored either by hospital personnel or by being kept in a locked box and dispensed by a visiting medical professional. In addition, Plaintiff's substance abuse is reflected by Plaintiff's girlfriend's statements with respect to his abuse of his prescription medications and his family's concern that he needed substance abuse treatment.

Under these facts, and primarily because the MA is the only mental health professional who had access to the entire record, the Commissioner did not err by relying on the MA's testimony that while Plaintiff satisfied the Listings, his substance abuse is a factor material to that disability determination thereby making Plaintiff ineligible for benefits under the Act.

Plaintiff also argues that the Commissioner erred by rejecting Drs. Wee's and Dr. McIntosh's opinions. Plaintiff correctly notes that there are occasions when the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v.*

*Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004).

For the same reasons that the Commissioner did not err by relying on the MA's opinion that Plaintiff's substance abuse is a factor material to the determination that he is disabled because he satisfies the Listings, the Commissioner did not err by rejecting Dr. Wee's and Dr. McIntosh's opinions. Specifically, a review of the record reveals that neither Dr. Wee nor Dr. McIntosh had reliable information with respect to Plaintiff's substance abuse. In other words, both Dr. Wee and Dr. McIntosh apparently based their opinions on Plaintiff's self-reports with respect to his alcohol and drug use, reports which, as noted, vary substantially throughout the record.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

May 13, 2009.

                                                   s/ Michael R. Merz
                                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).